960 So.2d 1042 (2007)
Ernestine LEE
v.
RYAN'S FAMILY STEAK HOUSES, INC.
No. 2006 CA 1400.
Court of Appeal of Louisiana, First Circuit.
May 4, 2007.
Rehearing Denied June 28, 2007.
William R. Mustian, III, Metairie, Counsel for Plaintiff/Appellee Ernestine Lee.
*1043 Albert D. Giraud, Karen G. Arena, Baton Rouge, Counsel for Defendant/Appellant Ryan's Family Steak Houses, Inc.
Before: KUHN, GAIDRY, and WELCH, JJ.
GAIDRY, J.
In this case, defendant, Ryan's Family Steak Houses, Inc. ("Ryan's"), appeals a judgment in favor of plaintiff, Ernestine Lee, awarding damages for injuries sustained in a slip-and-fall accident. We reverse.

FACTS AND PROCEDURAL HISTORY
This suit arises from a slip-and-fall accident which occurred at Ryan's on June 23, 2003. The accident was captured on video-tape by one of Ryan's surveillance cameras. The area shown on the video included two parallel food bars with an aisle in between ("parallel food bars"), and a third bar running perpendicular to the other two ("perpendicular food bar"). The video shows a Ryan's employee discovering some sort of spill in the aisle separating the perpendicular food bar from the parallel food bars. The employee stands watch over the spill while waiting for help. Another employee arrives with a mop bucket and proceeds to mop the area, while a third employee places a warning cone in the middle of the aisle. The cone appears to be about three feet tall[1] and is yellow with two exclamation points and a picture of a person slipping. The employee mopping the floor nudges the cone with the mop while mopping, leaving the cone about a foot or two to the right of its original position. After the employee finishes mopping, he exits the area and leaves the warning cone in place. The video shows Ms. Lee entering the food bar area soon after the mopping is finished, wearing shorts and athletic shoes. She inspects the food on the parallel food bars, then proceeds to the perpendicular food bar. Before reaching the perpendicular food bar, she appears to look down, then she steps up to the bar. After glancing at the food, Ms. Lee turns around and walks back the same way she came, passing the warning cone for the second time. She again appears to look down at the floor and then slips and falls right beside the cone. As Ms. Lee is starting to slip, a Ryan's employee, later identified as Shabriell Nikona McKey, appears in the video standing beside Ms. Lee. After Ms. Lee fell, a crowd began to gather around her. A chair was brought in and she was raised to a standing position, but after a few minutes the chair was removed and Ms. Lee laid back down on the floor in the same spot she fell to wait for emergency assistance. The floor in the area of the fall was re-mopped by what appears to be the same employee who originally mopped it. Customers continued to walk between the three food bars while Ms. Lee laid on the floor. Paramedics eventually arrived and Ms. Lee was placed on a stretcher and removed from the restaurant.
Ms. Lee filed a petition for damages against Ryan's in which she alleged that as a result of the fall, she suffered injuries to her neck and lower back, an increase in seizure activity, and other injuries. Ms. Lee testified at trial that on the day of the accident, she walked up to the perpendicular bar to look at the food, then noticed that the floor was slippery, and looked down and saw water on the floor. After seeing the water on the floor, she turned and looked at the manager,[2] then started *1044 walking back the way she came. She testified that the floor in her path had not felt slippery when she initially walked to the perpendicular bar. She denied seeing any warning signs in the area indicating that the floor was wet. She took about five or six steps and then slipped and fell on the floor, hitting her head. She testified that she began screaming because her head and back hurt. Ms. Lee claims that she had a seizure[3] "a few minutes" after the accident at Ryan's, and that the paramedics treated her for a seizure on the way to the hospital[4]; however, the EMS Run Report from West Jefferson Medical Center does not contain any mention of a seizure, and specifically states that there was no loss of consciousness. Ms. Lee claimed that the accident caused a five-month-long exacerbation of her pre-existing health problems.[5]
McKey, the cashier and server at Ryan's who witnessed the accident, testified that prior to the accident, a spill had been mopped up by a Ryan's employee and two warning cones[6] were placed in the area afterwards. Immediately prior to the accident, McKey was walking to one of the parallel food bars to refill the stack of clean plates and was beside Ms. Lee as she approached the perpendicular food bar. McKey testified that:
As [Ms. Lee] was walking to the [perpendicular food] bar, I said, how are you doing, ma'am? Watch your step. The floor is slippery. Because we hadwe had the signs out, but she was walking to the bar, and I was walking with the plates, but I was just letting her know because he had just mopped up the spill. So she was walking, she turnedshe was turning around, you know, because she was just looking. She hadn't had her plate yet. So she was turning around to go to the [parallel food] bar. And she was like, all right, baby. As soon as she was saying that, it was like she just slipped. And I said, I just told the woman to watch her step. And she just slipped down and she fell as she was turning around.
Dr. Michael Russo, a family practice physician, treated Ms. Lee both before and after the accident at Ryan's. He testified that she had a history of, among other things: cervical disc disease, tension headaches, and seizure disorder, which he noted may have a "pseudo-seizure[7] component to [it]." Dr. Russo saw Ms. Lee on June 18, 2003, five days before her accident at Ryan's. At that visit, she complained of dizziness,[8] chronic headaches, and weight problems. Dr. Russo's notes from that date also indicate that she "continues *1045 to have severe back pain with reduced motion."
Ms. Lee returned to Dr. Russo on July 2, 2003, approximately ten days after the June 23, 2003 accident. At that visit, she reported that she had recently slipped and hit her head and that she had been taken to the Emergency Room. Her chief complaints on July 2 centered around her headaches, which Dr. Russo opined could have been caused by her pre-existing cervical disc disease, by a sinus infection,[9] or by muscle spasms; dizziness, which Dr. Russo testified could be caused by medication she was taking, a concussion, or middle ear pathology and neck pain. Based on her complaints of pain, Dr. Russo increased the dosage of the pain medication she was taking prior to the accident, gave her a shot of Toradol for pain, and also did trigger-point injections for muscle spasms in the trapezius area. While Dr. Russo admitted that muscle spasms in the trapezius area could be caused by trauma to the neck, he said that it is "fairly nonspecific," and it did not appear that there was an "acute marked change" in Ms. Lee's status at the July 2 visit compared with the visit five days prior to her accident. He stated that "Ms. Lee is a very hysterical patient. And it's . . . hard to figure out where her discomfort is coming from. . . . [S]he did have chronic pathology before the fall, and she continues to have chronic pathology afterwards. It's hard to say what, if any, impact the fall made on her functional status." Ms. Lee also complained of right foot pain, which she associated with her fall, at a July 16, 2003 visit.
Regarding whether Ms. Lee suffered an exacerbation of her chronic, untreated pain following the accident, Dr. Russo testified that "the period right after the fall she did have some . . . worsening in her status. Now whether or not that's secondary to the fall or not, that's very difficult to discern. Ms. Ernestine is someone with a lot of nonspecific complaints the way she presents. . . ." When asked whether he noted an increase in Ms. Lee's seizures during the six-month period following the accident, Dr. Russo stated that given the way they were "juggling her medicines" during that time period, even if she did have an increase, it would be hard to say whether it was directly related to the accident or whether it was secondary to the medications. He testified that pseudo-seizures would not usually be directly related to a head injury, although they could be "secondarily [related] as a result of somatization of an anxiety problem." Dr. Russo also testified that withdrawal seizures and even pseudo-seizures could result when a patient suddenly stops taking certain medications without properly tapering off of them, as his records show Ms. Lee did after the accident.
After trial, the judge ruled in favor of Ms. Lee and against Ryan's. The trial judge stated that there was no doubt that there was a substance of some sort on the floor and that it was immediately addressed by Ryan's. He also found that Ms. Lee was looking only at the food on the bars, and not at the floor or the area around her, and he believed that she did not see the warning cone beside her, "even though it's visible." The judge also noted that the area where Ms. Lee slipped was the "exact same area she transversed [sic] before."
In determining whether Ryan's exercised reasonable care under the circumstances of this case, the judge found that Ryan's made an effort to remedy the problem and warn its customers immediately upon noticing the problem existed; the floor was immediately mopped in the area of the spill and a warning cone was put out *1046 to alert customers to the wet floor. However, the judge also found that the placement of the cone in defeated its intended task, i.e., preventing a slip-and-fall, because the placement of the cone could:
give reasonable minds different interpretations. It could either apply to this petitioner from her direction or it could not. It could apply from someone coming from the left direction because it's in the middle of that aisle or it could comeapply to the person coming up the opposite direction. It could apply to them. So it's a territorial type of analysis I'm doing.
The trial judge noted that the cone had no words, but only "symbols expressing someone slipping . . . which . . . suggest[s], if you can see it and if you're looking at it, that it's a dangerous area." The judge ultimately determined that Ryan's breached its duty to Ms. Lee because:
The cone has no directional symbols. The cone has no arrows suggesting exactly where to come, where not to come. I find fault with that because, if I'm going to use the aisle where the cone is and there's apparently the permission of Ryan's to the customer that you may still migrate this area, you may still use this area in spite of the fact that I've warned you it's wet. That is the nature of what I'm determining. The cone does not say: Do Not Enter. It is not fenced off. It is not prohibited. It is a permissive granting of use of the zone but its purpose is to raise the heighten [sic] alertness to the patron that as you migrate across this area, be upon some higher standard of mobility.
Despite his determination that Ryan's was liable for Ms. Lee's accident, the trial judge assigned twenty percent of the liability for the accident to Ms. Lee because:
at least she should have seen or paused when that sign appeared so, so vividly there. It should have heightened her notice to some extent that she couldn't just go on as usual that either not to traverse or to gather more data before you traverse. Something should have triggered to put [her] on increase [sic] alertness even though [she was] not directly focusing on the sign.
The trial judge found that the accident caused a four-month exacerbation of Ms. Lee's pre-existing health problems and awarded $2500.00 for each of the first two months and $2000.00 for each of the third and fourth months. Ryan's appealed, asserting that the trial court erred in finding Ryan's liable for Ms. Lee's injuries and in awarding damages.

DISCUSSION
Louisiana Revised Statutes 9:2800.6(B) governs the plaintiff's burden of proof in a slip-and-fall case:
In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant's premises, the claimant shall have the burden of proving, in addition to all other elements of his cause of action, all of the following:
(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable.
(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence.
(3) The merchant failed to exercise reasonable care. In determining reasonable care, the absence of a written or verbal uniform cleanup or safety procedure is insufficient, alone, to prove failure to exercise reasonable care.
*1047 The trial judge's finding that Ryan's failed to exercise reasonable care under the circumstances due to the design of the warning cone and its placement is a factual finding subject to the manifest error/clearly wrong standard of review. See Stevens v. Winn-Dixie of Louisiana, 95-0435 (La.App. 1 Cir. 11/9/95), 664 So.2d 1207. The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong but whether the factfinder's conclusion was a reasonable one. Stobart v. State, Department of Transportation and Development, 617 So.2d 880 (La.1993). The reviewing court may not disturb reasonable evaluations of credibility and reasonable inferences of fact when viewed in light of the record in its entirety even though it feels its evaluations are more reasonable.
In this case, however, the trial judge's oral reasons for judgment were internally inconsistent and we do not believe that his conclusions were reasonable. First, the trial judge found that Ms. Lee was looking only at the food on the bars, and not at the floor or the area around her. However, Ms. Lee's own testimony contradicted this finding. She testified at trial that as she approached the perpendicular food bar, she noticed that the floor was kind of slippery and she looked down and saw that there was water on the floor. She then looked at a Ryan's employee, who she believes was a manager, before beginning to walk back though the area and slipping. Ms. Lee also appears twice to be glancing down at the floor on the surveillance video.
Second, Ms. Lee testified, and the trial judge believed, that she did not see the warning cone before she fell. The trial court based its finding of liability on the design of the cone and its placement failing to alert her to the hazardous condition. However, it is clear from Ms. Lee's own testimony that she noticed that the floor was slippery and saw the water on the floor before she began walking back through the wet area. Therefore, the placement and design of the cone were of no consequence in alerting Ms. Lee.
Finally, we find the trial judge's findings that the cone should have had "directional symbols" or arrows or language showing exactly where to go and where not to go to be unreasonable. A merchant is not the insurer of the safety of its patrons and has only a duty to exercise reasonable care under the circumstances for the safety of its patrons. Gardner v. Griffin, 97-0379, p. 5 (La.App. 1 Cir. 4/8/90), 712 So.2d 583, 587. We find that an approximately three-foot-high yellow warning cone containing the universal symbol for a wet floor to be adequate to alert a patron of a hazardous condition. It would be unreasonably burdensome to require a merchant to have a supply of cones with words and arrows explaining the circumstances of every possible hazardous condition to its customers. While it may have been more prudent for Ryan's to have placed more than one cone in the area after mopping, Ms. Lee's fall would not have been prevented by the placement of multiple cones. She entered the food bar area from the direction of the parallel food bars, walked within a foot or two of the warning cone on her way to the perpendicular food bar, then discovered the water on the floor for herself before turning and returning the same way she came and falling right alongside the warning cone. Ms. Lee knowingly walked back through an area she knew to be wet and slippery, despite the fact that she saw a Ryan's employee, possibly a manager, standing nearby, who she could have summoned for help.
Finally, we find that the trial court's finding that Ms. Lee suffered a four-month exacerbation of her pre-existing problems with her back, neck, and *1048 head, and with seizures, to be unsupported by the record. Ms. Lee testified that her problems were worse in the five months following the accident; however, Dr. Russo simply could not conclude, more probably than not, that Ms. Lee suffered a five-month exacerbation due to the accident. Furthermore, the evidence in the record shows that the increase in severity of Ms. Lee's symptoms seemed to actually start the week before the accident at Ryan's.
Because we find the factfinder's conclusions as to liability and damages to be manifestly erroneous, the judgment of the trial court awarding damages to Ms. Lee for her accident at Ryan's is reversed. Costs of this appeal are assessed to plaintiff, Ernestine Lee.
REVERSED.
WELCH, J., concurs with reasons.
WELCH, J., concurring.
I concur with the opinion insofar as it reverses the trial court's liability determination. The trial court found liability on Ryan's part based on the placement of the warning cone. While great deference is owed to the trial court's factual determinations, I find that the placement of the cone did not cause the slip and fall accident. Ms. Lee admitted that she noticed the floor was slippery before she traversed the wet area and acknowledged that she was walking slowly down the path she had just walked through prior to her fall. Under these facts, the trial court's liability ruling was manifestly erroneous, and the reversal of that ruling makes it unnecessary to address the issue of damages.
NOTES
[1] The cone is about hip-or-waist-high to most adults on the video.
[2] It is not clear from the record whether it was truly the manager Ms. Lee looked at after noticing the water or Ryan's employee Shabriell McKey.
[3] She described the "seizure" as "just like a weird feeling just come over me."
[4] When questioned about the treatment she claimed she received in the ambulance for a seizure, Ms. Lee testified that the paramedics put something in her nose.
[5] Ms. Lee has a long history of problems with her back, neck, and head and with chronic seizures. Ms. Lee testified that prior to this accident, she had been involved in eight other accidents wherein she claimed an injury to her neck, back, or head, or an increase in her chronic seizures.
[6] Only one warning cone is visible in the surveillance video.
[7] Dr. Russo defined a "pseudoseizure" as a "somatization of a seizure . . . expressions of anxiety as much as anything else." In a pseudoseizure, a patient tends to remain conscious and will try not to hurt himself. Dr. Russo testified that he attempted to get Ms. Lee to see a neurologist, Dr. Mohnot, in an attempt to determine whether she was having real seizures or only pseudoseizures, but she was reluctant to go.
[8] Ms. Lee attributed her dizziness to a medication she was taking.
[9] Ms. Lee's medical records reveal that she also suffered from sinus problems.